# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RONALD PRESSLEY, | ) | |
| Plaintiff, | ) | |
|  | ) | |
|  | ) | |
| v. | ) | **CIVIL ACTION** |
|  | ) | **NO. 16-40050-TSH** |
| NANCY BERRYHILL,[1] | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |
|  | ) | |

## REPORT AND RECOMMENDATION

**July 21, 2017**

Hennessy, M.J.

The Plaintiff, Ronald Pressley, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying him Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ"). (Docket #11). The Commissioner seeks an order affirming the decision. (Docket #17). By Order of Reference dated December 21, 2016, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #25), this matter was referred to me for a report and recommendation on these motions. (Docket #19).

For the reasons that follow, I hereby RECOMMEND that Pressley's Motion to Remand (Docket #11) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #17) be ALLOWED.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy Berryhill is substituted for Carolyn W. Colvin, as the Acting Commissioner of the Social Security Administration as of January 23, 2017.

I.      BACKGROUND

A.      Procedural History

Pressley filed an application for SSI on August 4, 2011.  (Tr. 145).  The application was denied initially and upon reconsideration.  (Tr. 191, 197-99).  At Pressley's request, a hearing was held by ALJ Stolfo on July 30, 2014.  (Tr. 66-103, 200-01).  ALJ LeCours took over the case and held a supplemental hearing on December 11, 2014.  (Tr. 104-43).  On February 12, 2015, ALJ LeCours issued a decision finding that Pressley had not been disabled from the date the application was filed, August 4, 2011, through the date of the decision.  (Tr. 29-59).

On March 9, 2016, the Appeals Council denied Pressley's request for review, making the ALJ's February 12, 2015 decision final and ripe for judicial review.  (Tr. 1-7).  Having timely pursued and exhausted his administrative remedies before the Commissioner, Pressley filed a complaint in this court on May 5, 2016.  (Docket #1).  Pressley filed the motion for reversal or remand on September 12, 2016, (Docket #11), and the Commissioner filed a cross-motion on December 16, 2016, (Docket #17).

B.      Personal History

At the time he applied for SSI, Pressley was fifty years old.  (Tr. 111).  He attended school until the twelfth grade but did not graduate.  (Tr. 72).  Pressley lives with his wife, his wife's minor son, his wife's adult daughter, and his wife's two grandchildren.  (Tr. 111, 125-26).  He does not have a driver's license.  (Tr. 133).

C.      Medical History

On December 29, 2009, Pressley began individual psychotherapy treatment with Dr. Christine Runyan, Ph.D. for depression and substance abuse.  (Tr. 460-61).  Pressley indicated that he would like to avoid drinking alcohol and using crack and heroin, stating that he had not

been drinking recently and had only used crack and/or heroin twice in the preceding month. (Tr. 460). He stated that Abilify helped his mood, and that this, in turn, helped him avoid drinking and using drugs, but that he had not yet filled his prescription due to the cost and transportation issues. (Id.). Dr. Runyan recommended that Pressley follow through on a medical plan to get Abilify and take as directed. (Tr. 461).

On September 8, 2010, Pressley reported to Dr. Runyan that he was compliant on his medications. (Tr. 447). Pressley stated that he had been out of Abilify for about a week and had noticed a marked difference in mood and impulse control. (Id.). Dr. Runyan noted that, while Pressley still had some episodes of drinking and drug use, they were much less and Pressley had reported that his urges to use had decreased while on the Abilify. (Id.). Dr. Runyan found Pressley's status to be improved. (Id.).

At a follow-up visit with Dr. Runyan on July 19, 2011, Pressley reported that he was experiencing pain in his knee, rating it as a six out of ten. (Tr. 443). Pressley stated that he was inconsistently taking his Abilify and expressed interest in discussing alternative medications. (Id.). He reported that he felt more in control of his substance abuse problem and was only occasionally drinking alcohol and reported use of drugs averaging twice a month. (Id.). Pressley stated that he felt highly volatile in his mood and experienced persistent anxiety, noting he did not like to be in crowds or new places or to be alone or away from comfortable surroundings for long periods of time. (Id.). Dr. Runyan noted that Pressley's responses to a patient stress questionnaire suggested severe symptoms of depression including thoughts of suicide at times, but with no intent or plan to act on them, and moderate to high levels of anxiety. (Id.).

Dr. Nicola Deangelis, M.D., evaluated Pressley for left knee pain on July 21, 2011. (Tr. 487). Pressley reported that he had knee pain, swelling, and occasional instability. (Id.). Dr.

3

Deangelis diagnosed early left knee osteoarthritis and a symptomatic left medial meniscal tear. (Id.).

On July 28, 2011, Pressley was evaluated by Dr. Ana George, M.D., for lower back pain. (Tr. 489).  Pressley stated that he experienced chronic pain and had tried a chiropractor and physical therapy in the past.  (Id.).  He reported that his medications were no longer providing adequate pain relief.  (Id.).  Dr. George stated that Pressley's upcoming knee surgery could relieve the pain and strain of his lower back muscles.  (Id.).  Dr. George also prescribed Pressley Etodolac in lieu of Naproxen.  (Id.).

On July 29, 2011, Dr. Deangelis performed a left knee arthroscopy, partial medial meniscectomy, and medial compartment and patellofemoral compartment chondroplasty on Pressley.  (Tr. 494).  Pressley returned to Dr. Deangelis for post-surgical follow up on August 4, 2011.  (Tr. 497).  Examination revealed a decreased range of motion in the knee and mild effusion.  (Id.).  Dr. Deangelis advised Pressley to bear weight as tolerated and to begin physical therapy.  (Id.).

On September 12, 2011, Pressley complained of significant back pain to Dr. Runyan, but stated that he seemed to be recovering fine from his knee surgery.  (Tr. 439).  Pressley stated that, although he was supposed to follow up with physical therapy, he had lost the piece of paper to do so.  (Id.).  Dr. Runyan reprinted the referral and Pressley expressed his intent to follow through with physical therapy.  (Id.).  While Pressley reported that he was doing "okay," his patient stress questionnaire responses suggested severe depression including thought of self-harm, although he denied any strong intention or plan to do so.  (Id.).  He stated that he tended to isolate himself and stay in the house and was not going out much, and that, when he did go out,

he was often tempted to use crack. (Id.). Pressley reported that he had used crack about once a month in the past couple of months, which was less than his previous use. (Id.)

Pressley followed up with Dr. George on October 13, 2011. (Tr. 498). While Pressley reported that his knee pain was much better since surgery, he stated that that he continued to suffer from back pain that caused spasms at times and interfered with his sleep. (Id.). Dr. George stated that, although Pressley "was supposed to go to physical therapy after surgery since physical therapy will be instrumental in his recovery and also to help him with his lower back pain because his knee pain was likely contributing to his lower back [pain] since he was not walking correctly due to his knee pain," Pressley had not yet gone to physical therapy. (Id.). Dr. George "strongly recommended" that Pressley go to physical therapy as this was the best way to help both his knee and lower back. (Id.). Dr. George also prescribed Flexeril to help with his back spasms at night. (Id.).

At a follow up visit on November 2, 2011 with Dr. Runyan, Pressley reported that he had not been taking his Abilify for the past month due to his inability to cover the copay and that he was unable to fill his Flexeril prescription for the same reason. (Tr. 437). He stated that he had yet to go to physical therapy, but expressed a renewed interest in doing so. (Id.). Pressley indicated that he had not used any illicit substances within the prior six weeks and expressed an extreme commitment and intention to stay drug free. (Id.). Pressley continued to limit his exposure outside of his apartment due to concerns about his impulse control. (Id.). Dr. Runyan observed that Pressley's condition was stable. (Id.).

In a letter dated November 9, 2011, Dr. George stated that Pressley would be unable to work because of knee pain following surgery for the next three-to-four months. (Tr. 481). On November 14, 2011, Dr. Runyan wrote a letter on Pressley's behalf noting that Pressley was

adherent to his treatment plan.  (Tr. 516).  Dr. Runyan stated that it was difficult for Pressley to access services and pay for his medication, and, as a result, he continued to experience symptoms and difficulty functioning related to his mood disorder.  (Id.).  Dr. Runyan opined that Pressley was not functioning well enough to actively seek or maintain employment.  (Id.).

On November 16, 2011, Pressley complained to Dr. Runyan of pain in his back.  (Tr. 434).  Dr. Runyan encouraged Pressley to pursue his physical therapy referral which he had yet to do.  (Id.).  Pressley reported that he had restarted his prescription of Abilify which appeared to be stabilizing his mood.  (Id.).  Pressley also reported that he had not used crack for over two months and was able to manage his significant cravings by staying home.  (Id.).  Dr. Runyan observed that Pressley's condition was stable.  (Id.).  Pressley's responses to the patient stress questionnaire reflected severe depression and suggested that he had thoughts that he would be better off dead or hurting himself in some way, although he denied any active suicidal intention plan or prior attempts.  (Id.).  The responses also suggested very severe levels of anxiety and post-traumatic stress disorder ("PTSD").  (Id.).

On January 18, 2012, Pressley reported to Dr. Runyan that he had not used illicit substances since his last visit.  (Tr. 431).  Dr. Runyan found Pressley to be in stable condition. (Id.).  Pressley stated that he continued to feel significantly depressed, which was reflected in his answers to the patient stress questionnaire.  (Id.).  Dr. Runyan noted that Pressley's answers also suggested significant depression and significant anxiety.  (Id.).  Pressley reported that he continued to take his Abilify.  (Id.).

Dr. Runyan completed a Psychiatric/Psychological Impairment Questionnaire on January 25, 2012 in which she diagnosed Pressley with bipolar disorder, anxiety disorder (specifically PTSD), and a substance use disorder in early remission.  (Tr. 544-51).  Dr. Runyan assigned

Pressley a current Global Assessment of Functioning ("GAF") score of 41 and noted that his lowest GAF score in the past year was 35.[2]  (Tr. 544).  Dr. Runyan stated that Pressley's chronic mental health condition often had a variable course of severity and would require long term and continuous monitoring and treatment.  (Id.).  Dr. Runyan noted that, based on Pressley's symptoms and his past history, his prognosis was such that he could manage his symptoms but that the illnesses would persist.  (Id.).  Pressley's primary symptoms were significant mood fluctuations and severe anxiety including hypervigilance, avoidance, intrusive thoughts, worries, physiological arousal, and reported sleep disturbances.  (Tr. 546).  Dr. Runyan found that Pressley's anxiety symptoms impaired his ability to make and sustain interpersonal relationships and to enter new or ambiguous situations.  (Id.).  Dr. Runyan opined that Pressley was markedly limited, defined as effectively precluded, in the ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; to sustain ordinary routine without supervision; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel to unfamiliar places or use public transportation.  (Tr. 547-49).  Dr. Runyan opined that Pressley was moderately limited, defined

---

[2] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).  A GAF score of 41 to 50 indicates serious symptoms or any serious impairment of social or occupational functioning.  Id.  A GAF score of 31 to 40 indicates impairment in reality testing or communication or major impairment in several areas.  Id.

as significantly affected but not totally precluded, in the ability to remember locations and work-like procedures; understand and remember one or two step instructions; carry out detailed instructions; make simple work-related decisions; ask simple questions or request assistance; and to set realistic goals or make plans independently. (Id.). Dr. Runyan also opined that Pressley was mildly limited, defined as not significantly affected, in the ability to carry out simple one to two step instructions and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id.). Dr. Runyan noted that Pressley experienced episodes of deterioration or decompensation in work-like settings which caused him to withdraw from the situation or exacerbated his symptoms. (Tr. 549). Dr. Runyan stated that Pressley was not a malingerer and that his impairments were ongoing, expected to last at least twelve months. (Tr. 550). Dr. Runyan concluded that Pressley was incapable of even low work stress and that he would be absent from work as a result of his impairments more than three times a month. (Tr. 550-51).

Dr. Runyan saw Pressley on February 1, 2012, and reported that his current status was improved and stable. (Tr. 430). Pressley stated that he had been drug free since his prior visit. (Id.). Dr. Runyan opined that Pressley suffered from PTSD and an inability to manage complex situations of being around a lot of people effectively. (Id.).

On February 2, 2012, Pressley complained to Dr. George of lower back pain as well as some right-sided upper chest and shoulder pain. (Tr. 477). On examination, Pressley had full range of motion in the lower back with some mild tenderness on palpation of the paraspinous region in the lumbar spine. (Id.). Pressley also had full range of motion in his shoulders with some tenderness on palpation of the pectoral muscle on the right side and somewhat diminished sensation of the right arm versus the left. (Id.). Pressley had full strength in both upper

extremities and intact reflexes.  (Id.).  Dr. George opined that Pressley's lower back pain was likely due to chronic musculoskeletal strain from degenerative joint disease, as demonstrated by an MRI taken in 2009 which showed bulging disks in the L3-S1 area without significant spinal stenosis.  (Id.).  Dr. George also stated that the right-sided upper chest and shoulder pain was likely musculoskeletal in nature.  (Id.).  At his next visit with Dr. George, Pressley had a somewhat limited range of motion in his lower back due to pain, and exhibited full strength in his lower extremities with equal and symmetrical reflexes.  (Tr. 474).  Dr. George observed that Pressley's lower back pain was stable.  (Id.).

On March 13, 2012, Dr. Runyan noted that Pressley was stable and that Pressley reported that he continued to be drug free.  (Tr. 426).  Pressley stated that he had been off his Abilify for a number of weeks due to his inability to afford medications.  (Id.).  Pressley's responses to a patient stress questionnaire suggested severe symptoms of depression including passive thoughts of suicide, and continued and severe symptoms of anxiety.  (Id.).

Dr. George completed a Multiple Impairment Questionnaire on behalf of Pressley on March 15, 2012.  (Tr. 566-73).  Dr. George diagnosed Pressley with lower back pain, a meniscal tear in his left knee, knee pain, patellofemoral syndrome, L3-S1 degenerative changes with bulging discs but no significant stenosis, and lower back spasm, and noted that he had a good prognosis.  (Tr. 566).  Clinical findings included very tense lower back muscles, a fair range of motion, negative straight leg raise, and improvement of pain with physical therapy.  (Id.).  Dr. George rated Pressley's pain, which she stated was constant and varying in intensity, as ranging from moderate to moderately severe, and his fatigue as moderate.  (Tr. 570).  Dr. George opined that, as a result of his impairments, Pressley could sit three hours and stand/walk three hours in an eight-hour day, and, when sitting, would need to get up and move around every twenty

minutes for a five minute period.  (Tr. 568, 570).  Dr. George further opined that Pressley could lift/carry ten pounds occasionally, and had significant limitations doing repetitive reaching and lifting because of his back muscles, but would be capable of repetitive handling and fingering. (Tr. 568).  Dr. George found that Pressley was moderately limited, defined as significantly limited but not completely precluded, from grasping, turning, and twisting objects with both upper extremities and using his arms to reach.  (Tr. 568-69).  Dr. George also stated that Pressley would be precluded from pushing, pulling, kneeling, bending, and stooping.  (Tr. 572).  Dr. George noted that Pressley did not suffer significant side effects from his medication.  (Tr. 569). Dr. George opined that Pressley's impairments would last at least twelve months, that he was not a malingerer, and that his symptoms would frequently interfere with his attention and concentration.  (Tr. 571).  Dr. George found that Pressley was capable of low stress due to his psychiatric illnesses.  (Id.).  Dr. George stated that Pressley would need to take unscheduled breaks every hour lasting, on average, ten minutes and that he would be absent for work more than three times a month.  (Id.).

On May 14, 2012, Pressley reported to Dr. Runyan that he had used crack on a couple of occasions in addition to drinking alcohol.  (Tr. 424).  Pressley identified that he was engaging in these behaviors due to stress as well as not having many things to do in his day.  (Id.).  Dr. Runyan found Pressley to be in stable condition and noted that Pressley found consistent use of the Abilify helpful.  (Id.).  Pressley expressed an intention to increase his exercise using weights. (Id.).

At a visit on August 31, 2012, Dr. Runyan noted that Pressley's status was stable, but not improving.  (Tr. 421).  Pressley continued to take Abilify, and, although he continued to experience back pain, was not interested in physical therapy at that time.  (Id.).  He was unable to

take Flexeril because it was not covered by his insurance.  (Id.).  Pressley reported that he had used drugs several times since his prior visit, tracking his use to periods of boredom as well as frustration with his circumstances.  (Id.).

On January 24, 2013, Dr. Runyan noted that Pressley's status was improving.  (Tr. 418). Pressley reported that, although he was currently experience a number of stressors, he had been able to avoid using crack.  (Tr. 418).  He indicated that his Flexeril was not working and that he continued to have significant back pain.  (Id.).

Pressley was seen for follow up of lower back pain by Dr. George on January 29, 2013. (Tr. 470).  Examination revealed tenderness to palpation, more so of the right sacroiliac joint, mostly in the paraspinous region, symmetrical and intact reflexes and full strength in the lower extremities, intact sensation in both upper and lower extremities, and negative straight leg raise. (Id.).  Although he stated that physical therapy had helped him in the past, Pressley did not feel that physical therapy would help him again at this point.  (Id.).  Dr. George gave Pressley a referral to the spine center for possible injections.  (Id.).

Pressley completed a function report on February 6, 2013 with the assistance of his wife. (Tr. 351-58).  He reported that, on a typical day, he lays in bed or sits on his couch and watches television.  (Tr. 351).  He stated that he takes care of some pets along with his wife and stepson. (Tr. 352).  Pressley explained that, prior to his condition, he could lift weights and go for walks, but that he was no longer able to enjoy these activities.  (Id.).  Pressley denied any problems with personal care and stated that he did not need reminders to take his medication.  (Tr. 352-53).  He reported that his condition affected his sleep as he sometimes slept a lot, but at other times was restless and could not stay asleep.  (Tr. 352).  Pressley stated that he did not cook or do any house or yard work, and shopped for food or household items in stores once a month with others.

(Tr. 353-54).   He reported that he traveled by foot, and could go out alone, including to his doctor's appointments.  (Tr. 354-55).   While he reported that he could not pay bills or use a checkbook, he stated he was able to count change and handle a savings account.  (Tr. 354). Pressley reported problems with lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, and getting along with others.  (Tr. 356).  He indicated that he could occasionally lift five pounds, could walk five to ten minutes before needing to stop for a two to three minute rest, and could pay attention for only a few minutes.  (Id.).  Pressley denied finishing what he had started, and stated that he did not follow written or spoken instructions well.  (Id.).  He also indicated that he did not get along well with authority figures and did "not at all well" handle stress or changes in routine.  (Tr. 357). Pressley stated that he was anxious if he was around too many people or when he had too much to do.  (Id.).

On March 27, 2013, Dr. Runyan observed that Pressley's status was stable, but with no significant changes.  (Tr. 416).  Pressley reported that he continued to stay drug free, although he continued to experience cravings.  (Id.).  Due to his complaints of chronic pain, Dr. Runyan discussed the possibility of Pressley coming to a living well with chronic pain group, an idea in which Pressley seemed extremely interested.  (Id.).  Pressley's answers to a patient stress questionnaire suggested severe depression and anxiety in addition to thoughts of suicide without any significant intent, plan, or rehearsal attempts.  (Id.).  Pressley's PTSD screen was positive. (Id.).

Dr. Bryan Kumiga, D.O., of the Spine Center evaluated Pressley for low back pain on April 1, 2013.  (Tr. 514).  Examination revealed full strength in the lower extremities; decreased range of motion on lumbar flexion and extension with paravertebral muscle spasm at L3-S1

bilaterally, slightly worse on the right; positive z-joint loading bilaterally, worse on the right; and some SI joint tenderness on palpation.  (Id.).  Dr. Kumiga diagnosed low back pain secondary to spondylosis, and facet arthropathy.  (Id.).  Pressley decided to pursue a trial of lumbar medial branch blocks.  (Id.).

In a letter dated April 1, 2013, Dr. Runyan opined that Pressley's mental health conditions were "fairly severe and chronic," and that he continued to experience symptoms and functional impairment.  (Tr. 574).  Dr. Runyan stated that, in her assessment, Pressley was "not functioning well enough to actively seek or maintain employment and that doing so would place him at elevated risk for worsening symptoms, relapse, and even greater impairment."  (Id.).

On June 28, 2013, Dr. George completed a second Multiple Impairment Questionnaire on Pressley's behalf.  (Tr. 588-95).  Dr. George diagnosed Pressley with chronic lower back pain due to multi-level posterior disc bulge, especially at the L4-S1 level.  (Tr. 588).  Dr. George rated Pressley's pain as moderate, but made no mention of fatigue.  (Tr. 590).  She opined that, as a result of his impairments, Pressley could sit for one hour and stand/walk for one hour in an eight-hour day, and when sitting, would need to get up every fifteen minutes for a fifteen minute period.  (Tr. 590-91).  Dr. George further opined that Pressley could lift/carry ten pounds occasionally, and could not push, pull, kneel, bend, or stoop.  (Tr. 591, 594).  Dr. George stated that Pressley was markedly limited, defined as essentially precluded, from grasping, turning, and twisting objects with both upper extremities; was moderately limited, defined as significantly limited but not completely precluded, from using his arms for reaching; and minimally limited in using his fingers and hand for fine manipulations.  (Tr. 591-92).  Dr. George concluded that Pressley was incapable of even low work stress, and would be absent from work about two to three times a month.  (Tr. 593-94).

Dr. Runyan completed a second Psychiatric/Psychological Impairment Questionnaire on July 9, 2013.  (Tr. 597-604).  Dr. Runyan assigned Pressley a current GAF score of 51 and noted that his lowest GAF score in the past year was 41.[3]  Dr. Runyan's opinions were not significantly different from those she gave in the 2012 form.  (Compare Tr. 544-51 with Tr. 597-604).

On July 9, 2013, Dr. Runyan completed a report in which she opined that Pressley was disabled without consideration of any past or present drug or alcohol use.  (Tr. 606).

At a follow-up appointment with Dr. Runyan on July 30, 2013, Pressley stated that he had not been taking his Abilify because he needed a refill.  (Tr. 583).  Dr. Runyan noted that Pressley had not experienced a significant change in his status and continued to be highly symptomatic.  (Id.).  His answers to a patient stress questionnaire suggested extreme symptoms of depression and high anxiety.  (Id.).  While he reported thoughts that he would be better off dead, he had no intention or plan of acting on those.  (Id.).  He also had a positive PTSD screen.  (Id.).  Pressley reported that he had used crack in the last couple of months, the last time being several weeks prior.  (Id.).

Pressley began seeing Dr. Mary Cooper, M.D., on August 1, 2013.  (Tr. 581).  Pressley reported that the injections performed by the Spine Center did not really help his pain.  (Id.).  Pressley rated his lower back pain as an eight on a scale of ten.  (Id.).  Examination revealed tenderness over the sacroiliac joints, a bit of spasm in the right sacral region, full bilateral lower extremity strength, equal bilateral sensation, and a negative straight leg raise.  (Id.).  Dr. Cooper encouraged Pressley to do physical therapy.  (Id.).

On September 11, 2013, Pressley had a follow up appointment with Dr. Cooper.  (Tr. 577).  Pressley complained of low back pain that came and went, and that was worse with sitting

---

[3] A GAF score of 51-60 indicates moderate symptoms or difficulty in functioning.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000)

and movement, but better when he lay down.  (Id.).  Dr. Cooper observed mild spasm in the right L1-L2 paraspinal area but no spasm on the left, and mild pain to palpation with mild pulling in the back.  (Id.).  Lumbar spine x-rays taken that day revealed four non-rib bearing lumbar type vertebra, and straightening of the lumbar lordosis without evidence of compression fracture or malalignment.  (Tr. 579-80).

Pressley's condition was stable when he saw Dr. Runyan on November 27, 2013.  (Tr. 622).  Pressley reported that he continued to feel stressed about lack of income and family relationships.  (Id.).

On December 9, 2013, Pressley reported to Dr. Cooper that he had used crack cocaine within the past few weeks, but did not express a desire to go into a rehabilitation program.  (Tr. 623).  Dr. Cooper reordered physical therapy for his back and added on his ankle.  (Id.).

The next day, Pressley saw Dr. Runyan and she observed that he was in stable status. (Tr. 625).  Pressley stated that he struggles with anxiety as well as irritability and frustration with respect to his familial situation.  (Id.).  Dr. Runyan referred him for a psychiatric consultation. (Id.).

Pressley reported that he felt increasing depressed and trapped at his appointment with Dr. Runyan on January 10, 2014.  (Tr. 631).  He acknowledged increased substance abuse and stated that he had missed some medical appointments due to his use of drugs.  (Id.).  While he did have thoughts of wanting to hurt himself, he did not express an intention or plan to do so. (Id.).  Dr. Runyan noted that Pressley's status was "[n]ot improving."  (Id.).

Later that day, Pressley was seen by Dr. Ankur Butala, M.D., for a psychiatric consultation.  (Tr. 626-30).  Pressley presented in no acute distress with appropriate affect and a linear and goal-directed thought process.  (Tr. 629).  He presented no active psychotic symptoms,

his speech was regular, and his concentration and attention were intact.  (Id.).  Pressley was fully

oriented, and his insight was present and judgment intact.  (Id.).  Dr. Butala prescribed Seroquel.

(Id.).

 At a follow up appointment with Dr. Cooper on January 13, 2014, Pressley stated that he

continued to use crack and had been using more lately.  (Tr. 633).  Dr. Cooper noted that

Pressley was currently in a depressed phase and had a passive death wish, but no active plan of

suicide.  (Id.).  Dr. Cooper stressed that Pressley needed to work on his resolution to stop his

substance abuse, because the effect of his bipolar medication would be clouded by any substance

use.  (Id.).

 On January 22, 2014, Dr. Runyan wrote a letter expressing that Pressley suffers from

"extreme symptoms of [PTSD]," and that, "although he has struggled with difficulty related to

substance abuse and dependence in the past, [she] did not believe that this is currently related to

his inability to work."  (Tr. 635).  She further opined that Pressley's PTSD was the primary

contributor to his inability to work.  (Id.).

 Dr. Cooper completed a Multiple Impairment Questionnaire on February 7, 2014 on

Pressley's behalf.  (Tr. 614-21).  Dr. Cooper diagnosed Pressley with spondylosis and facet

arthropathy, degenerative changes in the back, and muscle spasm.  (Tr. 614).  Dr. Cooper stated

that these would likely be lifelong issues, but could be managed with physical therapy.  (Id.).

Clinical findings included muscle spasm at the L1-L2 level with paraspinal tenderness.  (Id.).

Dr. Cooper stated that Pressley's primary symptom was pain, which she rated as moderate,

particularly with prolonged sitting.  (Tr. 615-16).  She opined that his symptoms and functional

limitations were not reasonably consistent with his impairments, stating that he had not complied

with recommended therapies.  (Tr. 615).  Dr. Cooper noted that, if Pressley had complied with

the recommendations, and they did not help, her answer might be different, and she could not say whether he was a malingerer.  (Tr. 615, 619).  Dr. Cooper opined that in an eight-hour day, Pressley could sit for five hours and stand/walk for five hours dependent on the day, and that, when sitting, he would need to get up and move around every hour for fifteen to twenty minutes. (Tr. 616-17).  She stated that he could not push, pull, kneel, bend, or stoop.  (Tr. 620).  Dr. Cooper recommended that Pressley engage in a variety of activities without heavy lifting rather than prolonged sitting.  (Tr. 616).  Dr. Cooper opined that Pressley could lift/carry five pounds frequently and five to twenty pounds occasionally.  (Tr. 617).  She found that Pressley was not limited in grasping, turning, or twisting objects; using his fingers or hand for fine manipulations; or using his arms for reaching.  (Tr. 617-18).  Dr. Cooper opined that Pressley could do a full-time competitive job requiring activity on a sustained basis and that he was capable of low work stress, but that his symptoms would be severe enough to interfere with attention and concentration periodically.  (Tr. 619).  Dr. Cooper stated that Pressley might need to take unscheduled breaks every hour that would last fifteen minutes.  (Tr. 619).  She opined that his impairments would cause him to be absent from work less than once a month.  (Tr. 620).

On March 17, 2014, Dr. Cooper observed that Pressley's mood had been stable, but that he always thought that he would be better off dead although he had no active suicide plan.  (Tr. 638).  Pressley stated that he had been mugged and beaten up, and may have lost consciousness. (Id.).  He complained that he had hurt his left knee during the incident.  (Id.).  Dr. Cooper emphasized to Pressley that he had agreed to make monthly visits with herself and Dr. Runyan, yet it had been two months since he had seen either one of them, and that, if he did not comply, she could no longer prescribe his Seroquel.  (Id.).

On April 2, 2014, Pressley reported to Dr. Runyan that he had not used drugs for several weeks.  (Tr. 640).  He stated that things at home remained up and down, and familial fighting continued.  (Id.).  Dr. Runyan found Pressley to be in "[o]verall stable" condition.  (Id.).

Pressley was seen for a psychiatry consult by psychiatric-mental health nurse practitioner Brenda Castrichini on April 9, 2014.  (Tr. 610-11).  Pressley reported that he felt depressed and had trouble concentrating.  (Tr. 610).  Castrichini observed that Pressley was fully oriented, had appropriate affect, average speech, and normal insight and judgment.  (Id.).  Castrichini repeated these observations when she next saw Pressley on April 23, 2014.  (Tr. 612).  She also noted that his memory and cognitive function were at baseline and that Pressley had not used crack cocaine since his last visit.  (Id.).

Pressley saw Dr. Cooper on April 23, 2014 for follow-up on his complaints of knee pain. (Tr. 641).  He complained that it was painful when he turned on it and during sleep.  (Id.).  He had not gone to physical therapy as recommended.  (Id.).  Examination of the knee revealed tenderness over the joint line on the left side and some clicking when bent.  (Id.).  An x-ray was negative for fracture, but did show arthritic changes.  (Id.).  Dr. Cooper stated that, while the pain was not necessarily going to go away, strengthening exercises and activity could minimize the pain.  (Id.).  Pressley reported that he had not used any illicit substances since February.  (Id.).

On April 28, 2014, Dr. Runyan observed that Pressley's status was "[o]verall stable, but no significant improvement."  (Tr. 643).  Pressley's responses to a patient stress questionnaire suggested severe depression and anxiety.  (Id.).  Pressley continued to indicate that he had thoughts that he would be better off dead, but had no intent or plan to harm himself.  (Id.).

At an exam of Pressley on May 21, 2014, Castrichini found that he was fully oriented, had appropriate affect, average speech, baseline memory and cognitive function, and normal insight and judgment.  (Tr. 613).

Pressley had a follow up visit with Dr. Runyan on June 5, 2014 following a domestic situation at his home that resulted in the Department of Children and Families becoming involved related to his seventeen-year-old stepson.  (Tr. 646).  Pressley expressed increased symptoms of depression and substantially increased symptoms of anxiety due to his moving out of his house and staying with a friend.  (Id.).  He stated that he had been drinking more due to the situation.  (Id.).  Dr. Runyan noted that Pressley's current status was "worse."  (Id.).  Pressley reported that he had gone for an intake appointment at AdCare for an intensive outpatient program, but had not gone back after someone approached him for drugs upon leaving AdCare.  (Id.).  Pressley made a commitment to reengage in treatment with AdCare.  (Id.).

On July 7, 2014, Pressley saw Dr. Cooper for an evaluation of his back pain and persistent knee pain.  (Tr. 709).  He reported drinking a pint of vodka, two days a week, to deal with the increased stress of living at his friend's house.  (Id.).  He denied current use of cocaine.  (Id.).  Pressley reported that he had fallen on his knee a couple of days prior, increasing the pain he had previously experienced.  (Id.).  He was wearing a brace on the knee, which seemed to help.  (Id.).  On examination, Dr. Cooper found palpable muscle spasm in the right and left side of the low back with some mild SI joint tenderness on the left, pain with active straight leg elevation, slightly decreased range of motion in his knee on flexion with accompanying pain, and pain with palpation of the medial joint line.  (Id.).  Dr. Cooper prescribed Lidoderm patches in lieu of Diclofenac and added acetaminophen to his other medications.  (Tr. 709-10).

At a follow up appointment with Dr. Runyan on August 20, 2014, Pressley reported that he was not using cocaine and had not been drinking alcohol.  (Tr. 712).  Dr. Runyan observed that Pressley's status was "[s]table, but overall doing better," despite the fact that his answers to a patient stress questionnaire suggested severe symptoms of depression including thoughts about wanting to hurt himself.  (Id.).

On August 28, 2014, Pressley had a follow-up visit with Castrichini.  (Tr. 704-05).  Pressley reported that he had been sober since June, and complained of pain and an irritable mood.  (Tr. 704).  On September 25, 2014, Pressley reported to Castrichini that he had not been using cocaine.  (Tr. 702-03).  At a follow up visit with Castrichini on October 23, 2014, Pressley reported that he was doing well, his mood was good, he was sleeping okay, and things were working themselves out.  (Tr. 707).  At each of these three visits, Pressley presented as fully oriented with appropriate affect; his attention, vigilance, and concentration were fully intact; he had intact long and short term memory; and he had good insight and judgment.  (Tr. 703, 705, 708).

At a visit with Dr. Cooper on October 27, 2014, Pressley complained of bilateral knee pain, worse in the left than the right and shortness of breath.  (Tr. 716).  Examination revealed midline to joint line tenderness over the left knee, with a good range of motion in both knees.  (Id.).  Dr. Cooper recommended Acetaminophen for the knee pain and noted that his shortness of breath could be developing COPD.  (Tr. 716-17).

In a report dated December 15, 2014, Dr. Runyan opined that Pressley was totally disabled without consideration of any past of present drug or alcohol use.  (Tr. 720).  Dr. Runyan stated that drug and/or alcohol use was not a material cause of Pressley's disability because, although he had slips in the past year, he was not currently using drugs or alcohol and remained

disabled.  (Id.).  On December 22, 2014, Dr. Runyan wrote a letter stating that, despite a couple

of slips in the prior eighteen months with using, it was her opinion that Pressley's claim for

disability was independent of the substance abuse, and that his slips had not otherwise worsened,

exacerbated, or caused his other conditions for which he was seeking disability.  (Tr. 722).  Dr.

Runyan clarified that Pressley had not relapsed and was not using regularly.  (Id.).

D.      State Agency Opinions

        On August 2, 2013, State agency psychologist Dr. Cole, Psy. D., reviewed the record and

opined that Pressley would be able to understand and remember simple instructions; carry out

simple, repetitive tasks; attend for a two-hour span during an eight-hour workday at a consistent

pace; handle occasional social interactions with the general public; and adapt to routine changes

in the work setting.  (Tr. 157-59).  Dr. Cole stated that Pressley would have occasional episodes

of irritability.  (Tr. 158).

        On August 9, 2013 Dr. Weeratne, M.D., reviewed the record and opined that Pressley

could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds,

could stand and/or walk for a total of six hours in an eight-hour workday, could sit for a total of

six hours in an eight-hour workday, and that his ability to push and/or pull was unlimited.  (Tr.

155-56).  Dr. Weeratne stated that Pressley could occasionally climb ramps, stairs, ladder, ropes,

and scaffolds; balance; stoop; kneel; crouch; and crawl.  (Tr. 156).  Dr. Weeratne indicated that

Pressley should avoid concentrated exposure to hazards.  (Tr. 157).

E.      Hearing Testimony

        A hearing before ALJ Stolfo was held on July 30, 2014, where Pressley, represented by

an attorney, and a vocational expert gave testimony.  (Tr. 66-103).  Pressley testified that he had

last used cocaine and alcohol three or four months prior to the hearing, indicating that his drug

use stemmed from stress.  (Tr. 74).  Pressley complained of constant general anxiety, (Tr. 85), and problems with his back and knee, (Tr. 77).  He indicated that the right side of his left knee hurt daily, especially when he was going up stairs or walking too far.  (Tr. 93).  Pressley also stated that he experienced PTSD symptoms daily, but that these symptoms diminished when he was at home.  (Tr. 85-86, 89).  When at home, Pressley testified that he watched television and took at least two naps a day, each lasting two to three hours.  (Tr. 89).  He also described trouble sleeping due to his back and knee pain; stating that sometimes his sleep was restful and at times it was interrupted.  (Tr. 91-92, 94).  Pressley testified that he could only sit for five to ten minutes, walk for ten to twenty minutes, or stand for twenty minutes due to the pain in his back and knee.  (Tr. 94-95).

Due to time constraints, the hearing before Judge Stolfo was adjourned and rescheduled for a supplemental hearing.  (Tr. 102-03).  Because Judge Stolfo was not available, ALJ LeCours took over the case and held a supplemental hearing on December 11, 2014, where Presley, represented by an attorney, and a different vocational expert gave testimony.  (Tr. 104-43).

At the December 2014 hearing, Pressley testified that he had been sober for seven months, but before that time he was drinking a half pint of alcohol and two forty-ounce cans of beer daily and using crack once or twice a month.  (Tr. 113-14).  Pressley stated that he could not work a full-time job due to anxiety issues, depression, panic attacks, back and knee pain, and problems with shortness of breath.  (Tr. 114-15).  He described his lower back pain as a daily throbbing, aching pain and also testified to a daily aching pain in his left knee.  (Tr. 115-16, 118).  Both his back and knee pain varied in intensity.  (Tr. 116, 118).  While Pressley stated that he wore a knee brace his wife had bought him to support his knee daily, he was not wearing it at the hearing.  (Tr. 119).  Pressley testified that he experienced shortness of breath when walking

22

short distances, accompanied by chest pain when climbing stairs.  (Tr. 122).  He also testified to

the symptoms of his depression which included hopelessness, anger, isolation, and feeling that he

was better off dead.  (Tr. 122-23).  He stated that he felt nervous and constantly worried about

his safety when in crowds.  (Tr. 129).  Pressley also explained that he had problems with his

memory and concentration, stating that he had difficulty remembering the ALJ's name although

he had been told it several times and had difficulty remembering things he had just read.  (Tr.

131-32).  Pressley testified that he fell asleep the minute he lay down and that he napped once in

the morning for an hour to two hours.  (Tr. 132-33).  Pressley reported that, at home, he cleaned

the cat litter and did the dishes, although he expressed difficulty with this chore due to the need

to stoop based on the position of the sink.  (Tr. 133).

Following Pressley's testimony, the ALJ asked the vocational expert to consider an

individual of Pressley's age, educational background, and past work experience who:

> [has] an ability to perform a range of light work; lift/carry is 20 pounds
> occasionally, 10 pounds frequently; the ability to stand and/or walk is six hour of
> an eight hour day, the ability to sit is six hour[s] of an eight hour day.  Assume
> further that [the individual] has occasional ability to balance, stoop, kneel, crouch,
> crawl, and climb ramps and stairs; we'll say never able to climb ladders, ropes,
> and scaffolds, must avoid concentrated exposure to hazardous conditions such as
> unprotected heights, and dangerous machinery.  Further work must consist of
> unskilled tasks, work with simple work related decisions with few work place
> changes.  Assume there can be occasional interaction with the general public,
> coworkers, and supervisors.

(Tr. 137-38).  The ALJ asked the vocational expert whether such a hypothetical individual could

perform any work.  (Tr. 138).  The vocational expert responded that such an individual would be

able to perform assembly, inspecting, and packing work.  (Id.).  The ALJ next asked the

vocational expert to consider the same facts as those posed in the initial hypothetical except that

interaction with the public would be limited to minimal.  (Tr. 139).  The vocational expert

testified that this change would make no difference in his findings.  (Id.).  In a third hypothetical

the ALJ asked the vocational expert to consider the same facts as those posed in the first two hypotheticals with the additional limitation that the individual would be off task twenty percent of the work day in addition to regularly scheduled breaks.  (Id.).  The vocational expert replied that such an individual would be precluded from working.  (Id.).  In a final hypothetical the ALJ asked the vocational expert to consider the same facts as those posed in the first two hypotheticals with the additional limitation that the individual would likely miss three days of employment per month.  (Id.).  The vocational expert testified that such an individual would be precluded from work.  (Id.).

F.     Administrative Decision

In assessing Pressley's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits.  See 20 C.F.R. § 416.920; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he is "doing substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that he is not disabled.  Id.  The ALJ found that Pressley had not engaged in substantial gainful activity since August 4, 2011, the application date.  (Tr. 34).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."  20 C.F.R. § 416.920(a)(4)(ii).  The ALJ determined that Pressley had the following severe impairments: degenerative disc disease, affective disorder, and anxiety disorder.  (Tr. 34).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the

Social Security Regulations.  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that Pressley did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  (Tr. 36).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  20 C.F.R. § 416.920(a)(4)(iv).  Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC.  20 C.F.R. § 416.920(e).  An individual's RFC is his ability to do physical and mental work activities on a sustained basis, despite limitations from his impairments.  20 C.F.R. § 416.945(a)(1).  The ALJ determined that:

> [Pressley] has the residual functional capacity to perform light work . . . except that the claimant is limited to occasionally lifting and carrying twenty pounds, frequently lifting and carrying ten pounds, and sitting, standing, and walking six hours in an eight hour workday.[4]  He has occasional ability to balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  The claimant is never able to climb ladders, ropes, and scaffolds.  He must avoid concentrated exposure to hazardous conditions such as unprotected heights and dangerous machinery.  The claimant is able to perform work that consists of unskilled tasks, work with simple work-related decisions with few workplace changes.  There can be minimal interaction with the general public.  There can be occasional interaction with coworkers and supervisors.

(Tr. 38).  The ALJ determined that Pressley had no past relevant work.  (Tr. 57).

At the fifth step, the ALJ asks whether the claimant's impairments prevent him from performing other work found in the national economy.  20 C.F.R. § 416.945(a)(4)(v).  The ALJ

---

[4] Light work is defined as:

> involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b).

determined that, based upon his RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that Pressley can perform.  (Tr. 57).  Accordingly, the ALJ found that Pressley was not disabled at any time from August 4, 2011, through the date of decision.  (Tr. 58).

II.     STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003).  Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at

146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This

includes the burden of establishing his RFC.  20 C.F.R. § 416.912(a).

III.    ANALYSIS

A.    Weight of Medical Opinions

Pressley asserts that the ALJ improperly discounted the opinions of Dr. Runyan, his

treating psychologist, and Dr. George and Dr. Cooper, his treating physicians, without providing

adequate reasoning and, therefore, substantial evidence does not support the ALJ's

determination.  (Docket #12 at 18-27).

A treating physician's opinion as to the nature and severity of a claimant's impairments is

entitled to controlling weight if it is consistent with "medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record."   20 C.F.R.  § 416.927(c)(2).   However, "[w]hen a treating doctor's opinion is

inconsistent with other substantial evidence in the record, the requirement of 'controlling weight'

does not apply."  Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 U.S. App.

LEXIS 14287, at *11-12 (1st Cir. June 9, 1994); see Leahy v. Raytheon Co., 315 F.3d 11, 21 (1st

Cir. 2002) ("When other evidence sufficiently contradicts the view of a treating physician, that

view appropriately may be rejected.").  When an ALJ does not afford controlling weight to a

treating physician's opinion, the ALJ must consider the following factors to determine what

weight to actually give the opinion:  the length, nature, and extent of treatment and the frequency

of the examination; supportability of the opinion by the evidence; consistency with the record;

the specialization of the treating source; and any other relevant factors which support or

contradict the opinion.   20 C.F.R. § 416.927(c)(2)-(6); see Rodriguez Pagan, 819 F.2d at 3

(holding that ALJ was not required to assign treating physicians' opinions controlling weight

because the opinions were based excessively on claimant's subjective complaints, rather than on objective medical findings).  The ALJ need not discuss each individual factor.  Healy v. Colvin, No. 12-30205-DJC, 2014 U.S. Dist. LEXIS 40940, at *41 (D. Mass. Mar. 27, 2014).  If the ALJ affords less weight to a treating physician's opinion after considering these factors, the court must uphold the decision so long as the ALJ's decision and reasoning are sufficiently clear. Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass. 2008).

      1.     Dr. Runyan

The ALJ assessed Dr. Runyan's opinions and afforded them little weight for several reasons. (Tr. 57).  First, the ALJ noted that the opinions were inconsistent with the medical evidence of record, which did not reveal evidence of frequent visits to the emergency room due to psychiatric symptoms or frequent and extended psychiatric hospitalizations.  (Id.).  Pressley argues that a lack of psychiatric hospitalizations is not inconsistent with a finding of disability. (Docket #12 at 21-22).  However, courts in this district have found that this is an appropriate factor for the ALJ to consider in determining the weight to give a medical source opinion.  See Wysocki v. Colvin, No. 13-30188-MGM, 2014 U.S. Dist. LEXIS 162281, at *8-9 (D. Mass. Nov. 19, 2014) (holding substantial evidence supported ALJ's decision to grant little weight to treating physician's opinion because plaintiff's medical records did not support contention that his psychiatric symptoms were disabling, noting that record "[did] not reveal any evidence of frequent and extended psychiatric hospitalizations or evidence of frequent visits to the emergency room due to psychiatric reasons."); see also Sanchez v. Colvin, 134 F. Supp. 3d 605, 614 (D. Mass. 2015) (upholding ALJ's analysis of opinion evidence, where ALJ considered whether impartial medical expert's opinion was consistent with the absence in the plaintiff's medical records of "any inpatient psychiatric hospitalizations, let alone of extended duration.").

Second, the ALJ found that Dr. Runyan's opinions that Pressley suffered from disabling impairments were contradicted by the results of Pressley's mental status examinations. (Tr. 57). This observation is supported by the record. On January 10, 2014, on the same day that Dr. Runyan observed that Pressley's status was "not improving," (Tr. 631), Dr. Butala noted that Pressley was fully oriented and in no acute distress with appropriate affect, linear thought process, regular speech, present insight, and intact judgment, concentration, and attention. (Tr. 629). Dr. Butala's notations are consistent with Castrichini's observations on April 9, 2014, that Pressley was fully oriented, had appropriate affect, average speech, and normal insight and judgment. (Tr. 610). Castrichini repeated these observations on April 23, 2014 and May 21, 2014. (Tr. 612-13). Similarly, on August 28, 2014, September 25, 2014, and October 23, 2014, Castrichini noted that Pressley presented as fully oriented with appropriate affect; his attention, vigilance, and concentration were fully intact; he had intact long and short term memory; and he had good insight and judgment. (Tr. 703, 705, 708). While Dr. Runyan noted that Pressley's answers to a patient stress questionnaire on August 20, 2014 suggested severe symptoms of depression including thoughts about wanting to hurt himself, (Tr. 712), on August 28, 2014, Castrichini observed that Pressley had a euthymic mood, (Tr. 705). She repeated this observation on October 23, 2014. (Tr. 708).

Third, the ALJ noted that Dr. Runyan's assessments were not supported by her own records. (Tr. 57). While Dr. Runyan opined that Pressley suffered from disabling impairments, and sometimes noted that he was without improvement, (see Tr. 416, 421, 583, 631, 643, 646), she frequently observed that his mental condition was stable, (see Tr. 416, 421, 424, 426, 430, 431, 434, 437, 622, 625, 640, 643, 712), and, at times, improving, (see Tr. 418, 430, 447, 712).

The inconsistencies outlined above provide substantial support for the ALJ's decision to discount the opinions of Dr. Runyan.  Although Dr. Runyan's notes could be interpreted as finding that, while Pressley is stable or improving, he nevertheless remains unable to work because of mental health conditions, this is not the only supportable reading of her notes.  The resolution of this conflict is for the ALJ.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).   Because the ALJ's resolution of this conflict is supported by substantial evidence, "[I] must affirm . . . even if the record arguably could justify a different conclusion."  Id.

Pressley argues that, even assuming Dr. Runyan's opinions were not entitled to controlling weight, the ALJ erred by failing to consider all of the factors provided in 20 C.F.R. § 416.927 as part of his evaluation of Dr. Runyan's opinions.  (Docket #12 at 23).  In discounting the opinions of Dr. Runyan, the ALJ focused on the consistency and supportability of these opinions with the record as a whole.  (Tr. 57).  However, in his decision, the ALJ outlined Pressley's lengthy treatment history with Dr. Runyan and noted her specialty.  (Tr. 41, 47-57).  It is clear that the ALJ was aware of the 20 C.F.R. § 416.927 factors and took them under consideration in making his decision.[5]

2.      Dr. George

The ALJ gave no weight to both the March 15, 2012 and June 28, 2013 opinions of Dr. George determining that these opinions were inconsistent with the medical evidence of record, other functional opinions, and Pressley's activities of daily living.  (Tr. 43-44). Pressley argues that it is unclear what treatment record findings the ALJ was referring to in discounting Dr. George's opinion.  (Docket #12 at 23-24).   Pressley also asserts that the ALJ could not

---

[5] For the same reasons, this argument is equally unavailing with respect to Dr. George and Dr. Cooper.  (See Tr. 35, 42-56).

supportably discredit Dr. George's opinion on the basis of any conflict with other functional opinions as the ALJ did not credit any other medical opinions on Pressley's physical impairments. (Docket #12 at 24). Furthermore, Pressley argues that the ALJ failed to explain how Pressley's activities of daily living contradict the limitations described by Dr. George. (Tr. 24). Contrary to Pressley's arguments, I find that substantial evidence supports the ALJ's assignment of no weight to Dr. George's opinions. A review of Pressley's treatment history with Dr. George, which is discussed extensively by the ALJ, is instructive.

On October 13, 2011, Pressley visited Dr. George following knee surgery with complaints of lower back pain. (Tr. 498). Dr. George noted that, although Pressley was supposed to go to physical therapy following his surgery and that the physical therapy would help him with his lower back pain, Pressley had not yet attended physical therapy. (Id.). Examination revealed a full range of motion of his lower back with some slight tenderness to palpation of the paraspinous muscles. (Id.). Dr. George "strongly recommended" that Pressley attend physical therapy as it was the best way to help his lower back. (Id.).

Pressley's next visit with Dr. George was on February 2, 2012. (Tr. 477). Examination revealed full range of motion in the lower back with some mild tenderness to palpation of the paraspinous region of the lumbar spine and a negative straight leg raise. (Id.). In discussing her assessment and plan for Pressley's back pain, Dr. George highlighted that Pressley had gone to physical therapy in the past and found it helpful. (Id.).

Pressley saw Dr. George again on February 23, 2012. (Tr. 474). Dr. George noted that Pressley's lower back pain had not changed since his last visit. (Id.). Examination revealed tenderness to palpation of the paraspinous region and into the buttocks of his lower back and sacrum, a negative straight leg raise, and somewhat limited range of motion of his lower back

due to pain.  (Id.).  Dr. George noted that Pressley's back pain was stable.  (Id.).  Following the visit, Dr. George indicated to her preceptor Dr. Lee that she did not believe that Pressley was disabled by his back pain at that point.  (Tr. 474, 498).

Dr. George did not see Pressley again prior to completing the Multiple Impairment Questionnaire on March 15, 2012.  In that questionnaire, Dr. George opined that Pressley could sit for only three hours and stand/walk for three hours in an eight-hour day.  (Tr. 570).  These disabling-level limitations are inconsistent with her own prior opinion, one month earlier, that Pressley was not disabled by his back pain.  Additionally, while Dr. George stated that Pressley's knee pain had improved with physical therapy, (Tr. 566), she at no point indicated the effect that physical therapy would have on her findings if Pressley had been compliant with the recommended treatment.

Pressley next saw Dr. George on January 29, 2013 for follow-up of his lower back pain. (Tr. 470).  Pressley indicated that the pain was the same he had been experiencing for many years but it seemed to be getting worse.  (Id.).  Examination revealed tenderness to palpation mostly in the paraspinous regions, a negative straight leg raise, and symmetrical reflexes and full strength in both lower extremities.  (Id.).  Dr. George noted that, although physical therapy had helped Pressley in the past, he did not feel it would help him again at this point.  (Id.).

Dr. George completed a second Multiple Impairment Questionnaire on June 28, 2013. (Tr. 588-95).  As highlighted by the ALJ, (see Tr. 43), in contrast to the first questionnaire, Dr. George found that Pressley could sit for only one hour and stand/walk for one hour in an eight-hour day, a decrease of two-thirds.  (Tr. 590).  The 2009 MRI which Dr. George relied upon in forming this opinion was the same one that she relied upon in the prior questionnaire.  (Tr. 567, 589).  Dr. George had only one visit with Pressley in between completing the two questionnaires.

32

While Pressley indicated at the January 2013 visit that he felt his pain was getting worse, Dr. George's examination of Pressley was consistent with prior examinations. (Compare Tr. 470 with Tr. 474, 477, 498). It was clearly within the ALJ's purview to find that the two questionnaires completed by Dr. George significantly conflicted without justification. Additionally, as with the prior questionnaire, at no point did Dr. George indicate the effect that physical therapy would have on these findings, although she did note that Pressley "has been to physical therapy in the past which has helped." (Tr. 590).

The ALJ also discounted the opinion based on evidence in the medical record revealing that Pressley's mental status examinations were generally within normal limits, he had intact concentration, and that he had euthymic mood on occasion. (Tr. 44). As detailed above, there is ample evidence to support the ALJ's finding. (See supra section III.A.1).

The ALJ also found that Dr. George's opinion of June 28, 2013 was inconsistent with the daily activities that Pressley had described, which were not limited to the extent expected given the complaints of disabling symptoms and limitations. (Tr. 44). Dr. George opined that Pressley could sit for only one hour and stand/walk for one hour in an eight-hour workday. (Tr. 590). In a function report completed by Pressley on February 6, 2013, Pressley reported that he took care of his pets, traveled by foot, could go out alone, and could walk for five to ten minutes before needing to stop for a two to three minute rest. (Tr. 354-56). Pressley testified at the hearing before ALJ Stolfo that he could sit for five to ten minutes at a time, walk for ten to twenty minutes, and stand for twenty minutes. (Tr. 22). At the hearing before ALJ LeCours, Pressley testified that he cleaned the cat litter and did the dishes, although he expressed some difficulty with this chore due to the need to stoop based on the position of the sink. (Tr. 133). The ALJ supportably found that these activities conflicted with Dr. George's opinion. See SSR96-2p

(stating that an obvious inconsistency between a medical opinion and other substantial evidence exists "when a treating source's report contains an opinion that the individual is significantly limited in the ability to do work-related activities, but the opinion is inconsistent with the statements of the individual[] about the individual's actual activities[.]")

3.    Dr. Cooper

The ALJ accorded some weight to the opinion of Dr. Cooper, noting that Dr. Cooper's assessment was based somewhat on Pressley's non-compliance.  (Tr. 46).  The ALJ agreed with Dr. Cooper that Pressley had and would have more function when compliant with physical therapy and use of medications, and that Pressley had not complied with the recommended therapies.  (Id.).  However, the ALJ gave no weight to Dr. Cooper's assessment that Pressley would need to change position every fifteen minutes as the ALJ found this was not supported by the medical record.  (Tr. 46).

Pressley contends that the ALJ incorrectly determined that Dr. Cooper's opinion that he would need to change position every fifteen minutes was not supported by the medical record, and, instead, Dr. Cooper supportably based her opinion on evidence of muscle spasm at L1-L2 with paraspinal tenderness and the result of x-rays.  (Docket #12 at 25).   However, in her opinion, Dr. Cooper found that Pressley's symptoms and functional limitations were not reasonably consistent with his physical impairments, explaining, "[Pressley] has not complied with recommended therapies.  If he did, and they did not help, it might be different."  (Tr. 615).  Dr. Cooper also noted that Pressley's conditions "will likely be lifelong issues, but can be managed with physical therapy."  (Tr. 614).  These statements are consistent with Dr. George's "strong[]" recommendation that Pressley go to physical therapy as this was the best way to help both his knee and lower back, (see Tr. 498), and Dr. Cooper's many recommendations that

Pressley seek out physical therapy, (see 577, 581-82, 623).  Based on this record, the ALJ supportably discounted Dr. Cooper's assessment on the need to change position due to Pressley's noncompliance with recommended therapies and Dr. Cooper's opinion that Pressley would have more function when compliant.

B.     Credibility Determination

Pressley argues that the ALJ erred by failing to properly consider his subjective complaints, and that this error resulted in a flawed RFC.  (Docket #12 at 27-28).  The ALJ found that Pressley's medically determinable impairments could reasonably be expected to cause the symptoms alleged by Pressley, but Pressley's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  (Tr. 40).

An ALJ makes a proper credibility determination when such a determination is "supported by substantial evidence and the ALJ . . . make[s] specific findings as to the relevant evidence he considered in determining to disbelieve the applicant."  Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  If the ALJ finds that a claimant's allegations of disability are not credible, the ALJ must gather "detailed descriptions of claimant's daily activities, functional restrictions, medication and other treatment for pain, frequency and duration of pain, and precipitating and aggravating factors." Baez Velez v. Sec'y of Health & Human Servs., No. 92-2438, 1993 U.S. App. LEXIS. 12427, at *18-19 (1st Cir. May 27, 1993) (per curiam).  Known as the "Avery factors," these descriptions

must be carefully considered by the ALJ before he declares the claimant not to be credible.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986).

The ALJ properly considered the record and factors reflecting Pressley's credibility regarding his impairments.  The ALJ advanced three reasons, which touch on the Avery factors, for finding that Pressley was not credible.  I find that substantial evidence supports the ALJ's credibility findings.

First, the ALJ found that Pressley's activities of daily living were inconsistent with his allegedly disabling symptoms.  (Tr. 40-41).  Pressley asserted in a function report that he was able to take care of his personal care needs, shop in stores, count change and handle a savings account.  (Tr. 351-58).  He also indicated at a visit with Dr. Runyan on May 14, 2012, that he intended to increase his exercise using weights.  (Tr. 424).  The ALJ supportably determined that these activities conflicted with Pressley's allegations of disabling symptoms.  See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("evidence of daily activities can be used to support a negative credibility finding.").

The ALJ next noted that Pressley's psychiatric treatment was inconsistent with his allegedly disabling psychiatric symptoms.  (Tr. 41).  The ALJ highlighted that the record showed no evidence of visits to the emergency room due to psychiatric symptoms or any psychiatric hospitalizations, and, instead, revealed that Pressley had seen his treating psychologist only eight times between March 2013 and April 2014.  (Id.).  As discussed above, see supra Section III.A.1, a lack of hospitalizations or visits to the emergency room for psychiatric symptoms is an appropriate factor for the ALJ to consider in determining whether Pressley's allegations of disabling symptoms are credible.  See Wysocki, 2014 U.S. Dist. LEXIS 162281, at *8-9; see also Sanchez, 134 F. Supp. 3d at 614.  An ALJ may also appropriately discount a claimant's

credibility "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints."  SSR 16-3p.   The ALJ supportably determined that the combination of Pressley's treating history and the results of his mental status examinations, which revealed evidence of intact concentration and euthymic mood, (see Tr. 41), detracted significantly from Pressley's allegations of disabling psychiatric limitations.

The last basis of the ALJ's credibility determination was his observation that Pressley betrayed "no evidence of pain, discomfort, or psychiatric symptoms while testifying at the hearing."  (Tr. 41).  Contrary to Pressley's argument, the ALJ did not rely "heavily" on his observations of Pressley at the hearing, (see Docket #12 at 28), instead stating:

> While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain or psychiatric symptoms on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

(Tr. 41) (emphasis added).  An ALJ is free to consider any personal observations of the claimant in the overall evaluation of the credibility of the individual's statements.  SSR 96-7p.  The undersigned finds no error in the ALJ's consideration of this factor in making his overall credibility determination.

C.    Vocational Expert Testimony

Pressley argues that the ALJ's finding at step five that a significant number of suitable jobs exist in the national economy which Pressley could perform is inadequately supported by the evidence.  (Docket #12 at 29-30).

"The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence[.]"  Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011).  "In order to be substantial evidence, however, the opinion of the vocational expert must

be in response to a hypothetical that accurately describes the claimant's limitations." Id.; see Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982) ("in order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities.  To guarantee that correspondence, the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions.").

Pressley contends that the ALJ failed to accurately describe all of the mental limitations he found for Pressley in his hypothetical to the vocational expert.  (Docket #12 at 29-30).  In his opinion, the ALJ stated that Pressley had mild to moderate difficulties in social functioning and moderate difficulties with regard to concentration, persistence, or pace.  (Tr. 37).  In his hypothetical to the vocational expert, the ALJ limited Pressley to unskilled work with only simple work-related decisions and to only occasional interaction with coworkers and supervisors and minimal interaction with the general public.  (Tr. 138-39).  Pressley argues that the ALJ failed to include any restrictions accounting for moderate limitations in concentration, persistence or pace in the work environment.[6]  (Docket #12 at 29).

In the Mental Residual Functional Capacity form assessing Pressley, Dr. Cole stated that Pressley's ability to understand and remember detailed instructions was moderately limited as was his ability to carry out detailed instructions.  (Tr. 157-58).  Dr. Cole also stated that Pressley's ability to maintain attention and concentration for extended periods was moderately limited as was his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms.  (Tr. 158).  In light of these limitations, Dr. Cole opined

---

[6] Pressley concedes that the ALJ's hypothetical to the vocational expert, which limited the hypothetical individual to only occasional interaction with coworkers and minimal interaction with the public, accounts for the moderate restriction in social functioning.  (Docket #12 at 29).

that Pressley would be able to understand and remember simple instructions; carry out simple, repetitive tasks; and to attend for a two-hour span during an eight-hour workday at a consistent pace. (Tr. 157-58).

"A finding of moderate limitations in maintaining concentration, persistence, or pace, does not necessarily preclude the performance of unskilled work." Perry v. Astrue, No. 11-40215-TSH, 2014 U.S. Dist. LEXIS 139575, at *15 (D. Mass. Sept. 30, 2014). "When an acceptable medical source provides an opinion that despite moderate limitations in concentration, persistence, or pace the claimant is able to do unskilled work or simple routine work, no further restriction in residual functional capacity is necessary." Mudgett v. Colvin, No. 14-cv-143-JD, 2014 U.S. Dist. LEXIS 170099, at *8 (D.N.H. Dec. 9, 2014), (citing Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 14 (1st Cir. 2001) (concluding that a moderate limitation in nonexertional functioning required for unskilled work does "not affect, more than marginally, the relevant occupational base")).   While Dr. Cole found that Pressley's ability to maintain attention, concentration, and pace for extended periods was moderately limited, she determined that Pressley could perform simple routine tasks at an average pace over a regular full time routine. (Tr. 157-58).  The ALJ adequately accounted for the effects of Pressley's limitations with respect to concentration, persistence, and pace as opined by Dr. Cole in the hypothetical that he posed to the vocational expert, limiting Pressley to unskilled work with only simple work-related decisions.  Hence, remand is not required.

IV.     CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Pressley's Motion to Remand (Docket #11) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #17) be ALLOWED. [7]

/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[7] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).